NOTICE

Decision filed 12/03/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220415-U

NO. 5-22-0415

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Piatt County. |
| | ) | |
| v. | ) | No. 18-CF-65 |
| | ) | |
| CHRISTIE M. BROWN, | ) | Honorable |
| | ) | Gary A. Webber, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Barberis and Hackett* concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's judgments and sentences are reversed where the State failed to provide sufficient evidence for each element related to defendant's convictions for criminal abuse or neglect of an elderly person and criminal abuse or neglect of a disabled person; the trial court's judgments and sentences for defendant's convictions for aggravated cruelty to a companion animal are reversed where defendant was not the owner and no evidence to support a theory of accountability was submitted.

¶ 2    Defendant, Christie M. Brown, appeals her convictions stemming from two charges of criminal abuse or neglect of an elderly or disabled person (720 ILCS 5/12-4.4(a) (West 2016)) and two charges of aggravated cruelty to a companion animal (510 ILCS 70/3.02 (West 2016)). In

_____

*Justice Welch was originally assigned to the panel prior to his death. Justice Hackett was later substituted on the panel and has read the briefs and listened to the recording of oral argument.

1

support, she argues that the State failed to establish all necessary elements related to the alleged crimes. For the following reasons, we reverse the convictions.

¶ 3                                                I. BACKGROUND

¶ 4      Defendant resided with her brother, Ronald Blankenship, and defendant's two children, Mason and Amber, at 339 West Monroe Street in Monticello, Illinois. Mason's friend, Justin Tatman, frequently visited the residence. Ronald's power of attorney designated Mason and Justin as co-agents of his healthcare power of attorney. On August 20, 2018, Ronald was found dead in the residence. On August 24, 2018, defendant was charged with two counts of criminal abuse or neglect of an elderly or disabled person (counts I and II). Count I alleged a violation based on Ronald's age. Count II alleged that Ronald was disabled. Defendant was also charged with two counts of aggravated cruelty to a companion animal (counts III and IV). Count III was related to a black cocker spaniel; count IV was related to a brown cocker spaniel.

¶ 5      Defendant's trial was held from October 4, 2021, to October 7, 2021. On October 5, 2021, a stipulation was read prior to the State calling its first witness. The stipulation stated that if James Garlick would testify, he would state that he was defendant's adopted son and the adopted nephew of Ronald, that Ronald and defendant were brother and sister, and Ronald was over the age of 60 when he passed away. The following testimony was provided at trial.

¶ 6      James Keifer, a police officer with the Monticello Police Department was dispatched to the residence on Monroe Street on August 20, 2018, on a call for an unresponsive male who was not breathing and was blue in the face. When Officer Keifer walked to the driveway, Justin directed the officer to meet Mason by the back door. Officer Keifer testified that there was a strong odor of urine, mold, and feces. The officer was directed to Ronald's bedroom. He noted the room was very cluttered and dirty. He checked for a pulse, found none, and asked Mason if there was a do not

2

resuscitate (DNR) order. Mason advised Officer Keifer there was, and Justin was sent to retrieve the document. The officer proceeded to clear space on the floor so cardiopulmonary resuscitation (CPR) could be provided. However, once Justin returned with the DNR order, any attempt to provide life saving measures ended and the officer waited outside for the paramedics to arrive.

¶ 7    Officer Keifer testified that Ronald's room was filthy and disheveled with trash bags, dirty diapers, and medication boxes. He stated that Ronald was slumped over to his left side and was wearing an adult diaper that was improperly positioned exposing his genitalia. The diaper appeared soiled and Ronald appeared to be sitting on a soiled pad that was covered with urine and feces. Officer Keifer stated there were bugs on the mattress as well. The room was incredibly cluttered, a walker was overturned, a half-eaten sandwich was seen, and the room had a horrendous smell.

¶ 8    Once the coroner, Troy Dunn, arrived, Officer Keifer returned to Ronald's bedroom and took pictures of the room. He identified the photographs and explained what they showed. He explained that Ronald was connected to a machine that had "yellow fluid," and the tubing ran from Ronald's neck stoma to the machine. Officer Keifer stated that he left the scene but returned later that evening to collect the fluid and tubing, as well as to check the air conditioner at the coroner's request. When he returned, defendant had the officer wait until Mason or Justin arrived to let the defendant into the house. After the requested items were retrieved and the air conditioner was checked, the officer again left the scene.

¶ 9    Officer Keifer testified that he returned on August 23, 2018, after obtaining a search warrant. He took additional photographs of Ronald's bedroom which remained in the same condition as previously described. The photographs included a maggot on Ronald's mattress along with remnants of other bugs, soiled surgical pads, envelopes, medical boxes, cushions, and soiled linens. Photographs also depicted the cell phone next to where Ronald laid, garbage, a computer,

3

a trash can, an overturned walker, and a dresser to the left of the doorway. Officer Keifer described a strong aroma of ammonia, cat urine, feces, and mold which he said was "stomach turning."

¶ 10    On cross-examination, Officer Keifer clarified that he was the lead investigator on the case and Justin placed the call for the medical emergency. He confirmed that Justin, not defendant, was Ronald's power of attorney and further stated that Justin was not related to Ronald. He agreed that all ingress and egress was through the back door of the house. He stated that defendant and her daughter resided in the living room area of the home and Mason lived upstairs. He clarified that CPR was never performed. He agreed that a search warrant was executed on Ronald's cell phone, and the phone records were obtained. The officer also confirmed that they came to the house a third time on August 20, 2018, after Mason called to report two people tapping on Ronald's window.

¶ 11    Officer Keifer also explained his need to look at the air conditioner. He stated that there was a dispute between the residence where Ronald and defendant lived and their neighbors, the Johnsons. The dispute stemmed from a belief that the Johnsons were releasing the refrigerant from the air conditioning unit where defendant and Ronald resided. Officer Keifer stated that Mason opined that due to the Johnsons' release of the freon, the temperature in the residence was unsustainable for Ronald's life and therefore, the Johnsons murdered him. The officer's investigation of the air conditioning unit revealed that a lock had been placed on the unit. He agreed that defendant called a professional that morning to come out and look at the air conditioner unit.

¶ 12    Officer Keifer testified that Ronald's cell phone was found five or six inches from Ronald's bed. He agreed that the cell phones of defendant, Mason, and Justin were also taken in the search. He did not know the contents of Ronald's cell phone download. He was aware that Ronald previously worked as a nurse. He did not know who provided that information. He obtained

medical records but did not review them. So, he could not state who Ronald spoke to on the day of his death. Officer Keifer agreed that defendant and Amber moved into a motel after Ronald died and were not at the house when the officers returned for the suspicious person call. He also agreed that having the officers wait until Mason or Justin arrived was an appropriate response by defendant.

¶ 13    Officer Keifer further testified that pursuant to the house search warrant, they removed the garbage bags which primarily contained trash. The officer confirmed that Ronald's time of death was 7:22 p.m. and that Mason informed him that he last spoke with Ronald around 5 p.m. the day that Ronald died. Officer Keifer stated that Mason also informed him that he took food to Ronald and told Ronald to text him if he needed anything, but he did not hear back from Ronald.

¶ 14    Dr. Scott Denton, a board-certified forensic pathologist, performed Ronald's autopsy. When Ronald's body was received, Ronald was wearing a diaper soiled with urine and fecal material. He stated that Ronald looked "medically ill" with a tracheostomy in his neck, dried fluid on his abdomen, and a cyst on his chest. He also noted Ronald was thin with little muscle tissue in his abdomen. The internal examination revealed that Ronald had severe chronic, progressive pneumonia, a sealed voice box, chronic high blood pressure, and an old heart attack. His liver and spleen were enlarged.

¶ 15    Dr. Denton listed Ronald's cause of death as bronchopneumonia due to chronic bronchitis. He cultured purulent material found in the lungs to determine that four bacteria caused Ronald's pneumonia: Klebsiella, Citrobacter, Morganella and Proteus. He stated that all those bacteria cause diseases requiring medical treatment. He testified that contributions to Ronald's death included hypertensive heart disease, coronary atherosclerosis, and medical neglect. Dr. Denton stated that medical neglect could include neglect by others or self-neglect, and he included it on the death

certificate as a contribution to Ronald's death based on the photographs of Ronald's room given to him by the coroner. He stated that a tracheostomy site like Ronald had could cause bacteria to enter the lungs and infection to occur. Dr. Denton also testified that Ronald had diabetes, arthritis, gallstones, and suffered a heart attack years earlier. He stated Ronald was medically ill and appeared 10 years older than his biological age.

¶ 16    Troy Dunn testified that he was the coroner of Piatt County and was also a paramedic. He was dispatched to the residence on Monroe Street and found the conditions inside the house "deplorable" with trash piled up and an "ungodly stench." He stated there was an oxygen machine and numerous oxygen tanks in the room. Dunn testified that he had seen multiple oxygen machines over the course of his career. He explained that he took a picture of the cup of yellow liquid next to the machine, because, normally, the liquid would be clear water to humidify the oxygen coming out of the machine.

¶ 17    After receiving the autopsy report, Dunn filed Ronald's death certificate. The death certificate indicated Ronald was 64 years old at the time of his death and listed the cause of death as bronchopneumonia and chronic bronchitis. Failure by the family to seek medical care was listed as a contributing factor. Dunn testified that he did not review any of Ronald's medical records when preparing the death certificate and did not know if Ronald was ambulatory prior to his death. Dunn agreed that during his investigation, he learned that a plumber visited the residence the same day Ronald died. The plumber was there to check the air conditioning unit because there was a question about freon leaking. He stated that information was relevant to their investigation because excessive heat could have contributed to Ronald's death.

¶ 18    Jason Shumard, a Monticello police officer, assisted with the execution of the search warrant at 339 West Monroe on August 23, 2018, three days after Ronald died. Officer Shumard

6

testified that the house was "filthy" and he could "smell it from the road." He stated that Ronald's room had 11 trash bags containing used diapers. In an enclosed porch, Shumard discovered two dogs, he initially thought were dead, but realized one was breathing and called animal control.

¶ 19    Animal control officer Diana McPheeters was called to the scene to assist with the dogs. She testified that the porch floor where the dogs were found was covered in feces and additional feces were seen on the walls and gate. The porch also contained a dirty water bowl and a porch mat. McPheeters testified that one of the dogs was a brown cocker spaniel with tumors, limited vision, and almost no hair. The other dog was a black cocker spaniel. McPheeters took photos of the dogs and transported them to the animal hospital.

¶ 20    Dr. Kay Lindsay, a veterinarian, treated the dogs and testified that she previously provided care to both dogs. Dr. Lindsay testified that her records listed Mason as the owner of both dogs. She did not know exactly how old the dogs were but estimated them to both be between 12 and 16 years old. When the brown dog was brought in on August 23, 2018, she stated that he lost most of his fur from scratching, either because of an allergic reaction, fleas, or something environmental. She stated he also had eye, ear, and mouth infections. His nails were overgrown and caked with feces. Dr. Lindsay gave the brown dog a bath, trimmed his nails, and administered medication. The next day, Dr. Lindsay decided the most humane option would be to euthanize the dog.

¶ 21    Dr. Lindsay said the black dog had infected, open tumors. His nails were also overgrown and caked with feces. His teeth were bad, and he also had fleas. Based on his condition, Dr. Lindsay gave the black dog a sedative immediately and euthanized the animal. The conditions of both dogs were documented with photographs. Dr. Lindsay also testified that the animal hospital records indicated that both dogs had been to the hospital for treatment in 2014 and 2017, and both were up

7

to date on their rabies vaccines. She identified a receipt that indicated defendant's credit card was used to pay for the veterinary services provided on May 1, 2017, and on June 26, 2017.

¶ 22 Following Dr. Lindsay's testimony, the State rested its case. The State's exhibits were admitted into evidence without objection. Outside the presence of the jury, defense counsel made a motion for a directed verdict, which was denied.

¶ 23 On October 6, 2018, a stipulation was read that stated the defense's exhibit No. 10 was a true and accurate copy of the record of SMS messages and call logs subpoenaed and taken from Ronald's cell phone. The stipulation also provided for the admission of that exhibit. The messages in the exhibit ran from July 30, 2018, through August 20, 2018. The messages revealed requests from Ronald to have Mason or Justin obtain food or medications from Walgreens, take the trash out of Ronald's room, or contact Ronald's physicians to obtain refills for his prescriptions.

¶ 24 On August 15, 2018, Justin asked about Ronald's hand and Ronald advised of his hand's condition, requested food, and also requested a fan because he felt like he was smothering. When asked if Ronald adjusted the thermostat, Ronald said no. Return messages also indicated that Mason spoke to an air conditioning person, who made recommendations. A fan was purchased for Ronald on August 17, 2018.

¶ 25 On August 19, 2018, Ronald was having difficulty reading and stated his eyes were not doing well. He also indicated that the air conditioning was no longer working after 4 a.m. Ronald sent Justin a text at 3:30 p.m. that stated, "Chris pushing 4 me 2 put everyone n [*sic*] motel." Justin stated he would get more fans and be over shortly to place the fan in the window . Ronald's oxygen machine stopped at 4:16 p.m., and he requested help from Mason four times over the next six minutes. An hour later he was requesting that the large fan be turned toward him and more pullups be purchased. At 9:54 p.m., he said, "I need motel." Justin asked, "Did she sream [*sic*] at u?"

8

Ronald responded, "Telling m [*sic*] I will be dead by morning without ac." Justin stated it would be difficult to get him out at that time of night. No further messages were sent on that day.

¶ 26    On April 20, 2018, Ronald's messages started with a request to Mason at 7:32 a.m. for breakfast. Around 1:20 p.m., Ronald sent four messages to Mason. The first provided Ronald's lunch order. Thereafter, two additional messages were sent requesting Mason pick up medication and puppy pads. At 2:12 p.m. Ronald sent a message to Mason requesting help and stating that his oxygen machine was not working. At 2:36 p.m. Ronald asked Mason to order bottles and make "sure they know [it] is 4 o2 confrmser [*sic*]." At 4:27 p.m. Ronald sent a message to Mason stating he needed pads. No further messages were sent by Ronald, Justice, or Mason.

¶ 27    Dr. Steven Sparenberg, who was board certified in family medicine and Ronald's treating physician, stated that Ronald had tracheostomy and used an electronic device to talk. He identified 491 pages of Ronald's medical records, which were admitted without objection. He testified that he first saw Ronald on October 27, 2011. At that time, Ronald was 57 years old and had just moved back to Monticello from out of state. Ronald was ambulatory and there was no notation about someone accompanying him to the appointment. Dr. Sparenberg learned that Ronald had caught pneumonia and had to be intubated, which ultimately led to him getting a tracheostomy. Ronald was not working because of his disability and had developed sepsis, which was a dangerous blood infection that could cause death. Ronald also had a C-Pap machine that helped him get sufficient oxygen while he slept. Ronald's other medical conditions included a history of heart disease, asthma, atrial fibrillation, high blood pressure, high cholesterol, and Type 2 diabetes. Dr. Sparenberg opined that those conditions, combined with the fact that Ronald previously developed sepsis and had a tracheostomy, made him less resilient to disease than the average person, and

more prone to developing pneumonia. He agreed that an unclean environment could affect Ronald's lungs.

¶ 28    Dr. Sparenberg referred Ronald to a cardiologist for his atrial fibrillation and high blood pressure and advised him about nebulizer treatments and inhalers to help him with his asthma. He explained that a nebulizer produced a mist that an individual inhaled into the lungs to open the bronchial tubes. Dr. Sparenberg asked Ronald to come back in a month to make sure he was stable, but Ronald did not attend the follow-up appointment.

¶ 29    Throughout the several years preceding his death, Ronald returned to Dr. Sparenberg's office several times with pneumonia and was treated by Dr. Sparenberg or another physician in the office. Ronald told Dr. Sparenberg that he tried to stay out of the heat because it aggravated his medical conditions, requiring him to be inside by the air conditioning. Ronald also reported that at times, he could only walk about 100 feet.

¶ 30    Dr. Sparenberg stated Ronald had an appointment in August 2016 with Dr. Ellis, who practiced medicine with Dr. Sparenberg, following a hospital stay due to bilateral pneumonia. The medical records indicated that Ronald had been to the emergency room three times in the past two weeks. A culture indicated that Ronald's pneumonia resulted from a Proteus bacteria, which was treated with antibiotics. Dr. Ellis also noted in the records that Ronald lived with several family members, but they did not interact much, so it was like living on his own. The records further noted that Ronald was "pleasant, well appearing," and did not note that anyone else was with him.

¶ 31    Dr. Sparenberg testified that in 2017, Ronald's health began to worsen. In April, Ronald came to the office complaining of severe chest congestion and requested a new suction machine for his tracheostomy tube. Ronald did not state that he was unable to operate the machine himself or that he was unable to take care of himself. He received a prescription for another course of

antibiotics. In May, Ronald came to the clinic as a follow-up after being admitted to the hospital for pneumonia. His tracheostomy tube was changed during that hospital stay. Dr. Sparenberg prescribed another antibiotic, steroids, and Singulair to help with Ronald's asthma. Ronald complained that hot and humid air aggravated his breathing, so Dr. Sparenberg discussed making sure he was not around smoke, slept with an elevated pillow, and changed his furnace filters regularly.

¶ 32    On September 28, 2017, Ronald came to the clinic and saw Dr. Hoskins for a follow-up after another emergency room visit. Ronald complained of coughing, difficulty breathing, and increased sputum. Dr. Hoskins prescribed an antibiotic. Her notes indicated that a family member was with Ronald but did not specify who it was. Ronald told Dr. Hoskins that he felt better while on steroids, but that he did not want to take them long-term. His family member expressed that steroids were a good option for him.

¶ 33    In April 2018 Blakenship came to the clinic, following a discharge from the hospital where he was on "swing bed status". Dr. Sparenberg explained that a "swing bed" allowed an individual to be monitored at a lower level. Dr. Sparenberg stated that when Ronald was released, he was medically stable. Ronald was given no restrictions on physical activity and there was no indication that Ronald could not care for himself, his medical treatment, or his equipment. Dr. Sparenberg discussed different tests Ronald would need going forward and also directed him to continue with physical therapy. The note indicated that Ronald had designated an agent under a power of attorney but did not include the name of the designee.

¶ 34    Ronald was scheduled for a follow up appointment on July 17, 2018, but did not appear. The call log at Dr. Sparenberg's office indicated that on August 18, 2020, Tiffany Reed, an employee at Dr. Sparenberg's office, contacted Ronald at 9:17 a.m. about refilling a prescription.

11

Tiffany could not understand everything Ronald was saying, so he indicated that he would call back and have someone make an appointment for him. The call log indicated that at 9:56 a.m., Sherrie McCollum provided authority for the contact center to assist Ronald in scheduling an appointment and document when Ronald had been notified.

¶ 35   Dr. Sparenberg testified that at no time did Ronald appear that he was unable to take care of himself and he was never under the impression that someone else was taking care of Ronald or his medical treatment, affairs, and medical equipment except when Ronald obtained the healthcare power of attorney (POA). He stated that he would discuss executing POAs with his patients when necessary but there was nothing in his notes that indicated Ronald needed help. Dr. Sparenberg stated that Ronald appeared to be well educated about his medical conditions and was able to speak with him about those conditions. Dr. Sparenberg believed that, given all of Ronald's circumstances, Ronald did the best he could. He was aware that Ronald was dependent on other people for rides but did not know who they were. Dr. Sparenberg stated that he learned Ronald passed away on August 23, 2018. He stated that he was trained to look for signs of neglect but never noted any signs in Ronald. He never had the impression that Ronald needed to be cared for by somebody else. He stated that if he believed Ronald was being neglected, as a physician, he was required to report the neglect. Dr. Sparenberg never reported that Ronald was neglected.

¶ 36   On cross-examination, Dr. Sparenberg testified that due to having a tracheostomy, Ronald could not speak on his own and used a voice box. He stated it was very important to keep the tracheostomy clean because it could get infected easily. He agreed that Ronald was prone to pneumonia. He further explained that that with his health problems, Ronald would have been more susceptible to getting pneumonia and the pneumonia escalating more quickly than would someone without all his health problems. The underlying conditions included previous instances of sepsis,

12

diabetes, sleep apnea, and the tracheostomy, which undermined Ronald's resistance. Dr. Sparenberg stated that he still performed home visits but only saw Ronald in his office. He explained that he believed a patient could no longer take care of themselves if they did not know their medications, were in disarray, showed up an hour late or on the wrong day, or appeared disheveled or incoherent. Dr. Sparenberg testified that neglect displays as a person who could not care for himself, was unkempt, may not know cognitively what was occurring, or understand the best course of treatment. He agreed that Ronald did not attend the July 2018 appointment, and the last opportunity he was able to meet with Ronald was in April 2018. He did not believe Ronald was in any distress at that time.

¶ 37    Justin Tatman testified that he lived in Bement, Illinois, and that he had known defendant and Mason Brown since 1999. Mason was four years younger than Justin. He also knew Ronald and was aware that he lived in Chicago for a period of time before moving back to Monticello in 2014 or 2015.

¶ 38    Justin was familiar with the property at 339 West Monroe in Monticello, Illinois, that had two floors and a small attic. Utilizing a diagram of both the first and second floors, Justin identified the rooms in the home, where everyone slept, parked, and ate. Justin stated that he was Ronald's POA co-agent but stated the POA only took effect if Ronald was in a coma or could not speak for himself. The other POA co-agent was Mason. Justin stated that Ronald would text either him or Mason if he needed anything, including medical items, prescriptions, or food. Ronald also ordered medical supplies and other items online. Justin spoke to Mason every day and was one of the few people who could understand Ronald when he was not using his voice box. Ronald had a light voice but would point or use sign language, and Dr. Sparenberg was the only other person who could also understand Ronald without the box. Justin noted that half the time the box did not work.

13

¶ 39    Justin stated that he and Mason would take Ronald to Dr. Sparenberg's appointments. He stated that Ronald had a car up until about four or five months before he passed away. When he had a car, Ronald drove himself to the doctor's appointments. After Ronald stopped driving, Justin or Mason would take Ronald to the appointments in Justin's car. On those dates, Justin would also wheel Ronald into the room for his appointment and then wait in the waiting room for him.

¶ 40    Justin testified that Ronald cleaned his own medical equipment with pipe cleaners. He knew that Ronald needed distilled water for his breathing machine and changed the water himself. Justin did not try to change the water or clean the machines because he was "not allowed to" perform those tasks. If Mason or Justin tried to do something Ronald did not want them to do, he would get really upset and shake his walking stick at them. Justin testified that Ronald wore Depend adult diapers because sometimes he was too slow to get to the bathroom with his walker, and Ronald changed and managed those himself. Justin stated that Ronald did not start using the walker until after his most recent trip to the emergency room, when he stayed at the hospital for about two or three weeks.

¶ 41    Justin testified that Ronald was a hoarder and did not like people touching his stuff, including his bags of garbage. Justin and Mason could only take out the bags that Ronald said could be taken outside. Ronald's room was filled with items that he had ordered online and never opened: DVD's that were never watched and were still in their packaging, souvenirs from science fiction films he liked, newspapers from 20 years ago, old magazines, and multiple other items stacked up in boxes. The hoarding was limited to Ronald's room. Ronald asked Mason and Justin for help if he wanted or needed it. Just before he died, Ronald ordered a new bed and asked Justin and Mason to put it together for him when it arrived.

14

¶ 42    Frequently throughout the day, Ronald texted Justin or Mason for what he needed. Justin gave examples of the communication between him and Ronald based on the log of Ronald's text messages. On August 12, 2018, Ronald texted Justin and Mason asking them to get him some Neosporin, Iodine and a large bandage because he had an infected cuticle. On August 16, 2018, Ronald asked Justin to get him anti-fungal cream because he thought he might have diaper rash. There was also a text from Ronald on August 17, 2018, asking Justin and Mason to get him a fan because he was hot due to problems with the air conditioner.

¶ 43    Justin stated that Ronald requested a fan because the air conditioner was not working. He explained that freon was disappearing and both repair people who came to look at the appliance stated that "it had to have been messed with" because there was no freon leak. He said that one repairman came out four or five times in the same week that Ronald died. The repairman eventually put a lock on the air conditioning unit. Justin believed that Ronald's neighbors were taking the freon. He, Ronald, and Mason obtained restraining orders against them. Justin explained that for two or three weeks they were told that someone on Ronald's property was going to be murdered. Justin stated that he called 911 a few times and Ronald called it a few times as well. Justin stated that the police came out a few times the week before Ronald died and twice the week Ronald died.

¶ 44    On August 19, 2018, Ronald texted Justin stating that defendant was pushing him to put everyone into a motel. Ronald eventually texted that he wanted to go to a motel too. When Justin questioned why Ronald wanted to go to the motel, Ronald explained that defendant was really the only one who wanted to go to the motel. Ronald told Mason and Justin not to get a motel room under any circumstances. Justin did nothing because Ronald did not tell him to book a motel room. Justin stated that defendant and Ronald would argue about who would pay for repairs on the house.

15

Justin did not know how much either sibling had in the bank but knew that defendant worked as a nurse and Ronald drew a pension from where he previously worked as a nurse.

¶ 45 On August 20, 2018, Mason called Justin and said that Ronald wanted breakfast from Hardee's. Ronald was sitting in a rolling chair cleaning his oxygen machine when they brought Ronald the food. Justin asked Ronald if he would be online that night, since they usually played video games together at night, and Ronald said that he would be. When Justin was at the house, he did not believe Ronald was in any particular distress or needed anything medically at that time. Justin stated that Ronald thanked him for the burger and told Justin that he would not need anything from Justin for the rest of the day.

¶ 46 Justin returned to the house later that evening after Mason called him and said he did not think Ronald was breathing. As soon as he got to the house, Justin went into Ronald's room, checked for a pulse, and did not find one. Defendant thought Justin should wait to call paramedics until they cleaned up the place a bit, but Justin called 911. When the paramedics arrived, Justin provided a copy of Ronald's DNR order. Justin later called Glen Mankin, a retired navy pilot, and informed him of Ronald's passing. Mankin paid for the hotel that defendant and Amber moved to that night.

¶ 47 On cross-examination, Justin stated that about a month or two before Ronald died, defendant drove Mason, Justin and the black dog to a vet in Champaign for treatment after the dog's tooth shattered. Justin stated that Mason stayed outside the veterinary office crying because he was worried that the veterinarian would need to put his black dog down. So, defendant talked to the person treating the dog. Justin stated that defendant told Mason that if something was wrong with the dog, that he should euthanize him, but Mason refused.

16

¶ 48    Justin also explained that defendant and Ronald argued about money and expenses for the house. Ronald paid for groceries or fast food that he requested, which other people would eat as well. Justin stated that defendant wanted Ronald to move out of the house or sign off on his half of the house because she was concerned that if Ronald went to a nursing home, the nursing home could take the house if Ronald was an owner.

¶ 49    On redirect examination, Justin expressed concern with the fact that Ronald was not wearing a black hoodie when he found Ronald's body. He stated that Ronald rarely took it off but confirmed that Ronald could take it off and put it on by himself. He stated that it was not weird that the hoodie was off, but it was weird because the hoodie would have been on the bed if Ronald was not wearing it. However, both he and Mason looked for the hoodie, but never found it.

¶ 50    Attorney James Ayers testified that Ronald and defendant shared ownership of the house at 339 West Monroe as tenants in common. Defendant came to see him because she was concerned about sharing the house with her brother and she wanted to get him out of the house. After Ayers reviewed the deed, he advised defendant that as tenants in common with shared ownership, they both had equal right to possession of the whole house. Ayers advised that she probably could get an order of protection to get him out of the house. He further explained to defendant that if one of them were to die, the other would not get the house because there was no survivorship with joint tenancy. He further explained to defendant that to divide their ownership interest, defendant would have needed to bring a partition suit, but that was a long, expensive process. He further stated that the other option would have been for one of them to buy out the other's interest.

¶ 51    The defense rested. The State had no rebuttal witnesses. Defense counsel moved for a directed verdict, which was denied. The parties agreed which evidence should be allowed back with the jury for deliberations, and the evidence included all of the photographs of the dogs. After

17

deliberations, the jury found defendant guilty of criminal abuse or neglect of an elderly person, criminal abuse or neglect of a disabled person, and aggravated cruelty of a companion animal with respect to both dogs.

¶ 52    Defense counsel filed a post-trial motion requesting judgment notwithstanding the verdict, or a new trial. The motion alleged that the State's evidence was insufficient to support the finding of guilt, the verdict was against the manifest weight of the evidence, the trial court erred in denying defendant's motions by permitting the term "medical neglect" to be asserted as a legal conclusion and allowing the State to refer to Ronald and the dogs as victims. The motion further alleged that the court erred in overruling defense counsel's objection to the admission of jury instructions concerning accountability, and that the State failed to prove beyond a reasonable doubt that Ronald was unable to care for himself, as required to establish liability for a caregiver under Illinois law.

¶ 53    On May 17, 2022, the trial court denied defense counsel's post-trial motion and the matter proceeded to sentencing. In imposing defendant's sentence, the court noted that based on the evidence at trial and at sentencing, "[a]s far as we can tell [Ronald] was really not wanting [defendant] involved in his medical care at all." and that Mason and Justin were the people that took on the role of caring for Ronald. The court surmised that perhaps defendant thought that Mason and Justin were doing a sufficient job caring for Ronald, but it found that she never checked on him when she should have and she should have intervened with the dogs. It sentenced her to three years of probation for the offense of criminal abuse or neglect of an elderly or disabled person, which would include 180 days' incarceration in Piatt County jail. For the aggravated cruelty to a companion animal conviction, the court imposed a term of two and a half years of probation and ordered a mental health examination. Defendant appeals.

18

¶ 54                                    II. ANALYSIS

¶ 55    Before we address the merits, we must first determine if this appeal is moot. "An appeal is moot if no actual controversy exists or when events have occurred that make it impossible for the reviewing court to render effectual relief." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2016 IL 118129, ¶ 10. "As a general rule, courts of review in Illinois do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided." *In re Barbara H*., 183 Ill. 2d 482, 491 (1998).

¶ 56    Here, defendant was sentenced on May 17, 2022, to 180 days' incarceration on counts I, II, and III, followed by 36 months' probation for count I, and 30 months' probation for counts III and IV. The sentences of imprisonment were ordered to run concurrently. Defendant was granted a 4-day credit for previously served time, and credit for good time while incarcerated at the Piatt County Jail. Upon release, defendant's probationary conditions required her to undergo a mental health evaluation, submit a DNA sample to the Illinois State Police, and forego ownership of any companion animal. Based on the sentence and original credit, defendant would be released from the Piatt County jail no later than November 8, 2022, and thereafter, her three-year probation would begin. Therefore, it would appear that defendant's sentence has been completed.

¶ 57    Where "the appeal involves the validity of a sentence, such appeal is rendered moot if the sentence has been served." *In re Shelby R.*, 2013 IL 114994, ¶ 15. However, where, as here, the appeal concerns the validity of the conviction itself, completion of the sentence does not render the appeal moot. *Id.*; *In re Christopher K.*, 217 Ill. 2d 348, 359 (2005); *People v. Campbell*, 224 Ill. 2d 80, 83 (2006). As such, we address the merits of defendant's appeal.

¶ 58    Defendant raises three issues on appeal. She first contends reversal is required for the neglect charges where the evidence failed to show she was decedent's caretaker or that she had the

19

requisite *mens rea* for the offenses. Second, she contends that the State failed to prove that she intentionally acted to deprive the dogs of adequate care or that she was responsible for Mason's failure to obtain veterinary care. Finally, defendant contends her trial counsel provided ineffective assistance by failing to object to the gruesome dog photographs being allowed in the jury deliberation room. We address the sufficiency of the evidence claims first.

¶ 59        A. Criminal neglect of an elderly person or person with a disability

¶ 60    Where the sufficiency of the evidence is challenged, a reviewing court considers whether, viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48. "This means the reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). With regard to the neglect of Ronald, defendant argues that the State failed to prove she was a caretaker, and even if it proved that fact, it failed to prove she had the requisite mental state to commit the offenses.

¶ 61    To convict defendant of criminal neglect of an elderly or disabled person, the State was required to prove that defendant was a caregiver and as the caregiver, defendant knowingly failed to perform acts that she reasonably should have known were necessary to maintain or preserve the life or health of Ronald. See 720 ILCS 5/12-4.4a(b)(1)(B) (West 2016). For purposes of the section charged, a caregiver is defined as

   "a person who has a duty to provide for an elderly person or person with
   disability's health and personal care, at the elderly person or person with disability's
   place of residence, including, but not limited to, food and nutrition, shelter, hygiene,
   prescribed medication, and medical care and treatment, and includes ***:

20

> (1) A parent, spouse, adult child, or other relative by blood or marriage who resides with or resides in the same building with or regularly visits the elderly person or person with a disability, [who] knows or reasonably should know of such person's physical or mental impairment, and knows or reasonably should know that such person is unable to adequately provide for his or her own health and personal care." *Id.* § 12-4.4a(e)(1).

¶ 62 Here, defendant was Ronald's sister and lived in the same residence as Ronald. As such, given the undisputed layout of the residence, we cannot see how defendant would not know about Ronald's impairments as Ronald's potential need for admission to a nursing home was discussed with defendant's attorney when she tried to have Ronald removed from the house. Regardless, those facts fail to show that defendant knew Ronald was unable to adequately provide for his own health and personal care. More importantly, those facts fail to show that Ronald was unable to provide for his own health and personal care.

¶ 63 The evidence submitted at trial revealed that while defendant and Ronald were siblings, their relationship was strained, at best. It further revealed that Ronald directed his health and personal care. Justin testified that when Ronald could no longer drive himself to medical appointments, either Justin or Mason would take Ronald to the appointments that Ronald scheduled himself. Justin testified that Ronald would also tell him or Mason when to pick up his prescriptions, food, drinks, medical supplies and any items Ronald requested like a fan, Neosporin ointment, pads, diapers, or distilled water. Justin's testimony also revealed that Ronald would order items online including books, DVDs, and a bed.

¶ 64 As to Ronald's capabilities, Justin testified that Ronald, who was previously employed as nurse, changed his own adult diapers, fixed and cleaned his own medical equipment with pipe

21

cleaners, changed the water in his machine, directed when and which bags of garbage could be removed from his room, ambled to the bathroom with assistance of a walker, moved in his bedroom on a wheeled chair, participated in playing nightly video games, and dressed himself. Justin's testimony was supported by the log of Ronald's text messages to Justin and Mason. More importantly, Justin's testimony revealed that Ronald was doing many of these things on the day that he died and the log of Ronald's text messages revealed that he was sending messages to Mason as late as 4:27 p.m. that same day. Officer Keifer testified that Mason told him at the scene that he last saw Ronald alive around 5 p.m. when he brought Ronald food and told him to text him if he needed anything. Officer Keifer testified that he was dispatched to the residence at approximately 6:58 p.m. after Justin called 911 to report that Ronald was not breathing.

¶ 65    The State argues that defendant "could not possibly have shielded herself" from Ronald's living conditions as the conditions shocked the visual and olfactory senses of the officers and paramedics who were dispatched to the scene. It bolsters the argument by further reiterating Justin's testimony that revealed defendant advised Justin and Mason to clean up Ronald's room prior to calling 911. The State contends that based on the shared ownership of the home, defendant's residency in the home, awareness of Ronald's deteriorating physical condition, and the conditions of Ronald's room, a rational trier of fact could have found that "defendant had a duty at a minimum" to provide a habitable shelter that was not hazardous to Ronald's health while she shared the home with Ronald.

¶ 66    While we cannot disagree with the State's statement, the statement fails to account for the statutory requirements. See *id.* § 12-4.4a(e). In order to prove that defendant was a caregiver, the State was required to show that Ronald was unable to provide for his own health and personal care, and defendant knew about this inability. Here, however, the evidence revealed that the state of

22

Ronald's room was not due to Ronald's inability to clean the room but was an intentional choice made by Ronald.

¶ 67    Justin testified that Ronald would not allow either Mason or him to remove garbage bags at will. Ronald would tell them which bags could be removed and if they failed to adhere to Ronald's directives, Ronald would get upset and would shake his walking stick at them. Given this testimony, it is difficult to infer that defendant would have been allowed to perform an act Ronald refused to allow Mason and Justin to perform. Further, while Ronald could no longer drive, he directed his medical care through Mason and Justin. No evidence was presented that either man failed to provide Ronald with anything Ronald requested or that defendant had any reason to believe Ronald's medical treatment, food, and prescriptions were not being taken care of Mason or Justin. In fact, the evidence revealed the opposite.

¶ 68    Further, while Ronald's hoarder tendencies may be difficult to comprehend for some people, there was no evidence that Ronald's mental capacity was diminished or that he was not in complete control of how he wanted to live. Instead, the record demonstrated that Ronald was controlling his physical environment in a manner which he preferred, similar to how he was controlling his food and nutrition, prescriptions, medical care and treatment. Here, the record shows no evidence that Ronald was unable to provide for his own health and personal care. He made his own doctor appointments, cleaned his medical equipment, refused to allow others to remove garbage bags unless he directed them to do so, and obtained his prescriptions, food, drink, and personal items either online or by enlisting Mason and Justin to perform those services. Essentially, the record reveals that Ronald was living in a manner which he deemed appropriate and aside from his hoarder tendencies, did not affect his health and personal care. While we recognize that the statute is broadly written, given the undisputed evidence revealing Ronald's

23

ability to care for himself or rely on others to assist him with those tasks he physically could not perform, we cannot find that Ronald was unable to adequately provide for his own health and personal care. As such, we cannot find that defendant knew or reasonably should have known that Ronald had an inadequacy that did not exist. As such, we find it difficult to state that the evidence, even viewing all reasonable inferences in favor of the State, is sufficient to affirm the jury's finding that defendant was a caregiver.

¶ 69    Our review of case law under this statute is equally unavailing to the State's request for affirmation of the convictions. This is not a case where the victim was slapped in the face, punched in the chest, or fed pepper juice. See *People v. Johnson*, 231 Ill. App. 3d 412, 415 (1992). Nor is this a case where the victim was unfed for a week, left in a fetal position for two weeks, and was in a coma for several days before he was hospitalized (see *People v. Simester*, 287 Ill. App. 3d 420, 429-30 (1997)) or one where the victim fell out of bed onto a floor and was left on the floor for four hours by an experienced caregiver even after the caregiver knew the victim fell and was lying on the floor. See *People v. Trajano*, 2018 IL App (2d) 160322, ¶¶ 8-11.

¶ 70    Here, the victim took care of his personal affairs in the manner he deemed appropriate. He was conversant, relatively mobile, eating, and was cleaning his own medical equipment at least two hours before he died. While it was undisputed that Ronald's bedroom was a hoarder nightmare, the evidence revealed that Ronald dictated which materials, even if it was a garbage bag, could be removed from his room. The evidence also revealed that Ronald was aware of his need for a prescription for his pneumonia, requested it that day, and was unsuccessful in his attempt because the nurse could not understand him while he was speaking through his voice box. The testimony and log of Ronald's text messages also revealed that Ronald had no intention and no desire to move into a motel when the air conditioner stopped working at the residence.

¶ 71    In order to classify defendant as a caretaker, defendant had to know or reasonably should have known that Ronald could not adequately care for his own health and personal care. We cannot interpret the statute to require defendant's interference in Ronald's care where it was either unnecessary or unwanted by a person of sound mind. Given the evidence, we do not see how defendant would have been more successful than Mason or Justin in cleaning Ronald's room or moving Ronald to a motel while it was hot, when Ronald resolutely refused to part with his possessions, even if they were garbage, and adamantly refused to go to a motel even though the residence was hot. While it is undisputed that Ronald was aged enough to be classified as elderly and had sufficient medical conditions to physically disable him from continuing to work as a nurse, the evidence revealed that he managed his financial, personal, and medical affairs in the matter he deemed appropriate. While Ronald's room might properly be classified as squalid, Ronald had the resources to clean the room personally or through Mason or Justin. We do not read the statute as an opportunity to usurp a person with sound mind of their personal choices in life, no matter how displeasing or slovenly.

¶ 72    A conviction of criminal neglect, as charged here, requires the defendant to be a caregiver. 720 ILCS 5/12-4.4a(b) (West 2016). Because the State failed to submit sufficient evidence that Ronald could not adequately provide for his own health and personal care, we cannot find sufficient evidence to classify defendant as a caregiver. As such, we reverse the convictions of criminal neglect of an elderly person or a person with a disability in counts I and II.

¶ 73                    B. Aggravated cruelty to a companion animal

¶ 74    Defendant also argues that her convictions for aggravated cruelty to a companion animal should be vacated because the State failed to show that she intentionally acted to deprive Mason's dogs of adequate veterinary care or that she was responsible for Mason's actions in failing to obtain

25

veterinary care for his dogs. We again review the evidence in a light most favorable to the State to determine if any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). As noted above, a finding of guilt may be supported by both evidence and any reasonable inference that may be drawn from the evidence. *Cunningham*, 212 Ill. 2d at 279-80.

¶ 75    To be found guilty of aggravated cruelty to a companion animal, a defendant must intentionally commit an act that causes a companion animal to suffer serious injury or death. 510 ILCS 70/3.02(a) (2016). Omissions to take actions can also be considered an action. *People v. Land*, 2011 IL App (1st) 101048, ¶ 121. Intent is a mental state that can rarely be proven by direct evidence. *People v. Witherspoon*, 379 Ill. App. 3d 298, 307 (2008). Instead, circumstantial evidence taken from the surrounding circumstances, the character of the acts, and the nature and seriousness of the injury is often the only way to prove intent. *People v. Williams*, 165 Ill. 2d 51, 64 (1995); *People v. Rudd*, 2012 IL App (5th) 100528, ¶ 14.

¶ 76    Here, as above, the definitions are important in determining whether the State met its burden of proof. Companion animal is defined as "an animal that is commonly considered to be, or is considered by the owner to be, a pet." 510 ILCS 70/2.01a (West 2016). An owner is "any person who (a) has a right of property in an animal, (b) keeps or harbors an animal, (c) has an animal in his care, or (d) acts as a custodian of an animal." *Id.* § 2.06.

¶ 77    Here, two dogs were found on the porch. Both were in poor health, covered in feces, and in need of veterinary care. However, the evidence indicated, including testimony from the veterinarian, that Mason was the owner of the dogs. In fact, when one of the dogs was taken to the veterinarian prior to being taken by animal control, defendant recommended that Mason euthanize

26

the dog because of its poor health but Mason refused. That said, "owner" is defined more broadly in the statute and includes a person who harbors a dog.

¶ 78    In *Steinberg v. Petta*, 114 Ill. 2d 496, 500 (1986), the supreme court considered the meaning of "owner" under section 16 of the Animal Control Act (ACA) (510 ILCS 5/2.16 (West 2016)). At that time "owner" under the ACA was defined as,

> "any person having a right of property in a dog or other animal, or who keeps or harbors a dog or other animal, or who has it in his care, or acts as its custodian, or who knowingly permits a dog or other domestic animal to remain on or about any premise occupied by him." *Id.*

¶ 79    While similar, the definitions of owner under the ACA and section 2.06 of the Humane Care for Animals Act (HCAA) (510 ILCS 70/2.06 (West 2016)) are not identical. The ACA definition includes someone knowingly permitting an animal to remain on premises occupied by a person. However, in *Steinberg*, the court was addressing the "who keeps or harbors a dog" language in the ACA which is identical to the language in HCAA. Therein, the court stated:

> "The verb '[h]arbor' means to '[t]o afford lodging to, to shelter, or to give a refuge to.' [Citation.] Black's Law Dictionary defines '[k]eeper of dog' as: 'A harborer of a dog. [Citation.] Any person, other than owner, harboring or having in his possession any dog. [Citation.] One who, either with or without owner's permission, undertakes to manage, control, or care for it as dog owners in general are accustomed to do.' [Citations.]"

> Harboring or keeping an animal therefore involves some measure of care, custody, or control, and it is in those senses that the terms 'harbor' and 'keep' have been construed under this and similar legislation." *Steinberg*, 114 Ill. 2d at 501.

27

¶ 80    We agree that "no one has an obligation to feed, water, shelter or otherwise care for an animal that he does not own or for which he is responsible." *People v. Lee*, 2015 IL App (1st) 132059, ¶ 71. *Steinberg*'s interpretation of the phrase "who keeps or harbors" an animal under the ACA requiring more than putting a roof over an animal and the legislature's continued use of the same language under the HCAA after the *Steinberg* interpretation, requires this court to follow the precedent laid out by the Illinois Supreme Court. See *People v. Smith*, 2013 IL App (2d) 121164, ¶ 17 (when a statute has been judicially construed and the construction has not prompted an amendment, we may presume that the legislature has acquiesced in the court's determination of the legislative intent); see also *In re D.F.*, 332 Ill. App. 3d 112, 120 (2002).

¶ 81    Here, there is no debate that both dogs were found on the porch of the residence co-owned by Ronald and defendant. However, the only evidence related to managing, controlling or caring for the dogs was a credit card payment for a veterinary visit where defendant's presence was never established and a second veterinary visit where defendant was present, suggested euthanizing one of the dogs, and Mason refused to comply. With this being the only evidence, we cannot find that defendant was keeping and harboring the dogs based on the same language interpreted by our supreme court in *Steinberg*. As such, we must hold that that defendant was not an "owner" as defined in section 2.16 of the HCAA and therefore we reject the State's argument that the it provided sufficient evidence to affirm the convictions.

¶ 82    The State also charged defendant under an accountability theory. A person is legally accountable for the criminal conduct of another when:

> "before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to

aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2016).

To show accountability, the State was required to establish beyond a reasonable doubt that (1) defendant solicited, ordered, abetted, agreed or attempted to aid another in the planning or commission of the crime; (2) defendant's participation took place before or during the commission of the crime; and (3) the defendant had the concurrent intent to promote or facilitate the commission of the crime. *People v. Perez*, 189 Ill. 2d 254, 267-68 (2000). Defendant's argument again claims an insufficiency of evidence.

¶ 83    On appeal, the State's arguments requesting affirmation of the convictions were entrenched in defendant's intent as an owner, and no argument supporting an accountability theory was presented. The alleged crime was aggravated cruelty to a companion animal. This required the State to establish, beyond a reasonable doubt based on *Perez*, that the dog's owner, Mason, intended to cause harm to the dogs by failing to properly feed, water and provide veterinary care for the animals and defendant was legally responsible for Mason's failure to take the dogs to the veterinary clinic. While there are likely scenarios where evidence could support an accountability theory, this is not one of them.

¶ 84    "[N]o one has an obligation to feed, water, shelter or otherwise care for an animal that he does not own or for which he is responsible." *Lee*, 2015 IL App (1st) 132059, ¶ 71. Notably, Mason was an adult, under no known disability, and the owner of the dogs. Mason's refusal to euthanize one of the dogs when it shattered its teeth reveals Mason's ultimate control over what care and treatment, if any, would be provided to his dogs.

¶ 85    While the evidence at trial detailed the gross deprivation or food, water, humane treatment, and veterinary care, (see 510 ILCS 70/3(a) (West 2016)), defendant was not the owner and no

evidence as to why defendant would be accountable for Mason's inaction was presented. As such, we must reverse the convictions for aggravated cruelty to a companion animal and given the disposition herein, it is unnecessary to address defendant's ineffective assistance of counsel claim.

¶ 86                                      III. CONCLUSION

¶ 87    For the above-stated reasons, we reverse defendant's convictions for criminal abuse or neglect of an elderly person and criminal abuse or neglect of a disabled person (counts I and II) and defendant's two convictions for aggravated cruelty to a companion animal (counts III and IV).


¶ 88    Reversed.